# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KELLY KALUS,              )
                                   )
             Plaintiff,       )
                                   )     Case No. 13 C 2503
             v.                 )
                                   )     Judge Amy St. Eve
EMTEC, INC., and RICHARD REID,    )
                                   )
            Defendants.     )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On June 17, 2013, Plaintiff Kelly Kalus filed a four-count First Amended Complaint against her former employer Defendant Emtec, Inc. and Defendant Richard Reid, Kalus' former direct supervisor, alleging gender discrimination and a hostile work environment claim in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* (Count I), violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.* (Count II), a violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.* (Count III), and sex and handicap discrimination claims in violation of the Illinois Human Rights Act ("IHRA"), 765 ILCS 5/1-101, *et seq.* (Count IV).[1]

Before the Court is Defendants' motion for summary judgment and Plaintiff's cross-motion for partial summary judgment as to her FMLA claims in Count II brought pursuant to Federal Rule of Civil Procedure 56(a). For the following reasons, the Court grants Defendants'

---

[1] Courts analyze claims brought pursuant to the IHRA under the same legal standards for actions brought under Title VII and other federal anti-discrimination statutes. *See Teruggi v. CIT Group/Capital Fin., Inc.,* 709 F.3d 654, 659 (7th Cir. 2013); *Zaderaka v. Illinois Human Rights Comm'n,* 131 Ill.2d 172, 178, 137 Ill.Dec. 31, 545 N.E.2d 684 (Ill. 1989). Therefore, the Court need not address Plaintiff's IHRA claims separately.

motion for summary judgment and denies Plaintiff's motion for partial summary judgment. The Court dismisses this lawsuit in its entirety.

## BACKGROUND

### I. Northern District of Illinois Local Rule 56.1

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Local Rule 56.1(a) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." *Petty v. City of Chicago,* 754 F.3d 416, 420 (7th Cir. 2014). "The non-moving party must file a response to the moving party's statement, and, in the case of any disagreement, cite 'specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citation omitted); *see also* L.R. 56.1(b)(3)(A). Local Rule 56.1(b)(3)(c) "requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement ... of any additional facts that require the denial of summary judgment.'" *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012) (citation omitted). "The obligations set forth by a court's local rules are not mere formalities." *Zuppardi v. Wal-Mart Stores, Inc.,* 770 F.3d 644, 648 (7th Cir. 2014).

Here, Kalus' Rule 56.1(b)(3)(c) statement of additional facts in response to Defendants' motion for summary judgment, her Rule 56.1(a) statement of facts in support of her motion for partial summary judgment, and her Rule 56.1(b)(3)(A) responses do not meet the requirements

or spirit of the local rules. In particular, her statements and responses are riddled with legal arguments, speculation, and extraneous information. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006) ("statement of material facts did [ ] not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"). Kalus' Rule 56.1(b)(3)(A) responses to Defendants' statement of facts often fail to cite to any evidence in the record to refute Defendants' statements. *See Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion."). Also, both Kalus and Defendants include "recitations of additional facts" in their Rule 56.1(b)(3)(A) responses that the Court will not consider because, according to the local rules, any such facts must be in their Rule 56.1(b)(3)(C) statement of additional facts. *See Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643-44 (7th Cir. 2008). In other words, "Local Rule 56.1 requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement ... of any additional facts that require the denial of summary judgment.'" *Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803, 809 (7th Cir. 2005) (emphasis in original).

Furthermore, Kalus relies on her declaration to support her facts although some of the statements in her declaration contradict her prior deposition testimony. It is well-settled in this district that a party cannot "create an issue of material fact by submitting an affidavit that contradicts an earlier deposition." *Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 759 (7th Cir. 2006). In addition, certain averments in Kalus' declaration are hearsay or not within her direct personal knowledge as required by Federal Rule of Civil Procedure 56(c)(4). *See Smiley v.*

*Columbia Coll. Chicago,* 714 F.3d 998, 1005 (7th Cir. 2013) ("declarations in support of motions for summary judgment must be made on personal knowledge and set forth facts that would be admissible in evidence").

As the Seventh Circuit instructs, "[f]or litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment. The purpose of the local rule is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka,* 686 F.3d at 398. Indeed, district courts are "not required to scour the record looking for factual disputes." *Diadenko v. Folino*, 741 F.3d 751, 757 (7th Cir. 2013) (citation omitted).

The Court will consider these standards within each Rule 56.1 statement and response to determine the relevant facts of this case, instead of striking Kalus' Rule 56.1 filings in their entirety as Defendants suggest.

## II.     Relevant Facts

### A.     Emtec's Oracle Practice Groups[2]

Defendant Emtec, located in New Jersey with offices in Chicago, is an information-technology consulting company that specializes in packaged applications, cloud applications, application development, management consulting, and infrastructure services. (R. 75, Defs.' Rule 56.1 Stmt. Facts ¶ 4; R. 82, Pl.'s Rule 56.1 Stmt. Facts ¶ B.) Plaintiff Kelly Kalus began

---

[2] Oracle Corporation is a computer technology corporation that specializes in developing and marketing computer hardware systems and enterprise software products, including its own brands of database management systems. http://en.wikipedia.org/wiki/Oracle_Corporation (last visited on March 23, 2015).

her employment with Emtec's predecessor, Emerging Solutions, in July 2011, as the National

Practice Director of the Oracle Human Capital Management ("HCM") practice. (Defs.' Stmt.

Facts ¶ 5.) As the National Practice Director of the Oracle HCM practice, Kalus managed the

HCM consultants, marketing, staffing, recruiting, and business development. (R. 146, Kalus

Dep., at 34-35.) Defendant Richard Reid, the Oracle National Practice Managing Director,

offered Kalus the job and was Kalus' direct supervisor throughout the relevant time period

(Defs.' Stmt. Facts ¶¶ 5, 9; Pl.'s Stmt. Facts ¶ D.) Shortly after Kalus began her employment,

Emtec acquired Emerging Solutions in August 2011. (Defs.' Stmt. Facts ¶ 8.) After the

acquisition, Kalus continued in her role as the National Practice Director managing Emtec's

Oracle HCM practice. (*Id.*)

Kalus' peers in the Oracle group, who also reported to Reid, included John Given, the

National Practice Director for Oracle Financial, and Todd Siler, the National Practice Director

for Oracle Technical. (*Id.* ¶ 9.) Specifically, Given managed the Oracle financial products,

whereas Kalus oversaw the Oracle HCM products. (*Id.* ¶ 10.) As the Technical Lead, Siler

supported both Kalus and Given by providing technical staff on projects. (*Id.*) Kalus, Given,

and Siler each led a team of consultants in their respective practice areas and supervised one or

more practice managers, who in turn supervised a number of front-line consultants. (*Id.* ¶ 11.)

Approximately eight months after Kalus started in her position as National Practice

Director of Emtec's Oracle HCM practice, specifically, on February 17, 2012, Reid told the three

Oracle National Practice Directors, namely, Kalus, Given, and Siler, that Emtec planned to

expand its Oracle practice to work with Oracle's new "Fusion" software. (Pl.'s Stmt. Facts ¶ C.)

At or around that time, Reid decided to incorporate Oracle Fusion into the existing Oracle

practice groups led by Kalus, Given, and Siler, which increased their job responsibilities. (*Id*.; Defs.' Stmt. Facts ¶ 12.) Thereafter, Kalus went to Oracle's headquarters in California for training. (Pl.'s Stmt. Facts ¶ F.) At some point in May 2012, however, Reid decided to make structural changes to the Oracle group by separating Fusion from the existing practice groups and creating a stand-alone Fusion practice. (Defs.' Stmt. Facts ¶ 68; Pl.'s Stmt. Facts ¶¶ W.1, W.2.) Reid hired Steven Bentz as the Oracle Fusion Practice Lead in July 2012 tasking Bentz to "grow" this new practice. (Defs.' Stmt. Facts ¶ 68; Pl.'s Stmt. Facts ¶ V; R. 118, Defs.' Stmt. Add'l Facts ¶ 25.)

### B. Kalus' Medical Leave

On May 9, 2012, Kalus notified Emtec that she needed to take time off from work pursuant to the FMLA, as well as through short-term disability, due to a "serious condition." (Defs.' Stmt. Facts ¶ 12.) On May 12, 2012, Kalus, however, told Emtec's Head of Compensation and Benefits, Anita Dombrowski, that she would be using paid time off to address her condition and that she would not take FMLA leave at that time. (*Id*.) In early June 2012, Kalus notified Emtec that she was scheduled for surgery on July 23, 2012, and that she would need to take FMLA leave for up to eight weeks after the surgery. (*Id.* ¶ 13.)

Prior to her scheduled surgery, Kalus and Reid met on June 12, 2012, to discuss her pending project lists and address who would cover Kalus' projects during her FMLA leave. (Pl.'s Stmt. Facts ¶ P.) On June 14, 2012, Kalus and Reid sent a series of emails to each other regarding whether Kalus should step down as the National Practice Director of the Oracle HCM practice. (*Id*. ¶ Q.1.) After their email exchange, Kalus decided to continue in her role as the National Practice Director of the Oracle HCM practice. (*Id*. ¶ Q.1; Defs.' Stmt. Facts ¶ 58,

Defs.' Ex. 41.)

Also on June 14, 2012, Kalus notified Reid that she needed to take off work earlier than expected and effective immediately. (Defs.' Stmt. Facts ¶ 14.) In response, Dombrowski sent Kalus a letter approving the requested leave of absence effective immediately and placed Kalus on an unpaid leave of absence starting on June 14, 2012, ending when her FMLA leave commenced for her scheduled surgery on or about July 23, 2012. (*Id.* ¶ 15.) Although Kalus was not eligible for FMLA leave on June 14, 2012, because she had been with Emtec for less than one year, it is undisputed that Don Sweeney, the former President of Emerging Solutions and Emtec's Managing Director of Packaged Applications, emphasized to Emtec's Human Resources Department that Kalus' job was protected during her unpaid leave of absence and until her FMLA leave began. (*Id*. ¶ 16; Defs.' Stmt. Add'l Facts ¶ 3.) Also in June 2012, Kalus anticipated that she would return to work sometime in September 2012. (Defs.' Stmt. Facts ¶ 17.)

After her surgery, Kalus sent Dombrowski an email stating that she had a doctor's appointment on August 15, 2012, and wanted to explore whether her surgeon would allow her to return to work for four hours a day with no travel. (*Id*. ¶ 18.) Kalus asked Dombrowski if this arrangement would be acceptable with the business unit and further stated that, if it was, she would provide the appropriate medical clearance from her doctor. (*Id*.) On August 3, 2012, Kalus sent Dombrowski another email stating that she would not be able to work part-time as she had hoped, but instead that she would return to Emtec on or about September 17, 2012, as planned. (*Id*. ¶ 19.) After Dombrowski emailed Kalus on September 7, 2012, to "touch base" about Kalus' return to work, Kalus notified Dombrowski that she would not be returning to work

on September 17, 2012, but that she would get back to Dombrowski before the end of her FMLA leave period about her return date. (*Id.* ¶ 20; R. 76-19, Defs.' Ex. 19.)

Instead of returning to work on September 17, 2012, Kalus' attorney emailed Emtec a letter on that same date stating that Kalus would not be returning to work because she was "constructively discharged." (*Id.* ¶¶ 22, 23.) The September 17, 2012, letter also demanded a settlement amount of approximately $3 million dollars for Kalus' employment-related claims. (*Id.* ¶ 22, Defs.' Ex. 22, 9/17/12 letter.) While she was on FMLA leave, Kalus had secured a new job and started her new job one or two days after September 17, 2012. (*Id.* ¶¶ 21-24.) After Kalus left her employment at Emtec, Reid offered Kalus' position, namely, National Practice Director of the Oracle HCM Practice, to Jaynie Cosenza, who accepted the offer. (*Id.* ¶ 25.)

On December 11, 2012, Kalus filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR") alleging that Defendants discriminated against her because of her gender and disability. (*Id.* ¶ 2.) The EEOC mailed Kalus' right-to-sue letter on January 4, 2013, and Kalus filed this lawsuit on April 3, 2013.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there

is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). A court's "job when assessing a summary judgment motion is not to weigh evidence, make credibility determinations, resolve factual disputes and swearing contests, or decide which inferences to draw from the facts." *Miller v. Gonzalez,* 761 F.3d 822, 827 (7th Cir. 2014).

## ANALYSIS

### I.    Hostile Work Environment

In Count I of her First Amended Complaint, Kalus brings a hostile work environment claim based on her gender in violation of Title VII, which protects employees against a work environment that is so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Alexander v. Casino Queen, Inc.,* 739 F.3d 972, 982 (7th Cir. 2014) (citation omitted). To survive summary judgment on a hostile work environment claim based on gender, Kalus must present evidence creating a genuine issue of material fact for trial regarding the following: "(1) [her] work environment must have been both subjectively and objectively offensive; (2) her gender must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Orton-Bell v. Indiana,* 759 F.3d 768, 773 (7th Cir. 2014) (citations omitted). In determining whether a hostile work environment exists, courts

look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.E.2d 295 (1993).

In support of her hostile work environment claim, Kalus points to the following conduct: (1) Siler and Given would frequently interrupt her at meetings; (2) Given, Siler, and Reid would walk ahead of her when they visited clients and did not invite her to lunch; (3) Siler constantly disagreed with her when collaborating on work proposals refusing to cooperate with her on projects; (4) Siler's subordinates (direct reports) would complain about Kalus' female subordinates; and (5) Reid refused to listen and support her.[3]

Viewing the facts and all reasonable inferences in Kalus' favor–as the Court is required to at this procedural posture–she has failed to establish that her work environment was objectively offensive, although she has sufficiently established that she subjectively believed that these incidents were degrading and embarrassing. To clarify, although Kalus' co-workers, including her supervisor Reid, may have made her work at Emtec unpleasant, her work environment was not permeated with discriminatory intimidation, ridicule, and insult. *See Alexander,* 739 F.3d at 982. Also, Kalus' allegations that Reid, Given, and Siler were standoffish, unfriendly, or unapproachable do not establish an objectively hostile work

---

[3] The basis of Kalus' hostile work environment claim has been a moving target throughout this litigation. The Court addresses the incidents Kalus highlights in her legal memorandum in response to Defendants' summary judgment motion. The absence of any discussion regarding the other incidents mentioned in Kalus' 53-page First Amended Complaint amounts to the abandonment of these claims. *See Steen v. Myers,* 486 F.3d 1017, 1020 (7th Cir. 2007).

environment.  *See McKenzie v. Milwaukee Cty.,* 381 F.3d 619, 624 (7th Cir. 2004); *see also*

*Patton v. Indianapolis Pub. Sch. Bd.,* 276 F.3d 334, 339 (7th Cir. 2002) (plaintiff failed to show

a hostile work environment where supervisor "treated her in a rude, abrupt, and arrogant manner,

ignored her work-related suggestions and failed to keep her informed about changes at work").

The second-hand harassment by Siler's subordinates directed at Kalus' subordinates does not tip

the scale.  *See id.*; *see also Moser v. Indiana Dep't of Corr.,* 406 F.3d 895, 903 (7th Cir. 2005).

Indeed, as the Seventh Circuit has repeatedly held, "[n]ot all offensive conduct violates federal

law" because "Title VII is not a civility code."  *Patton v. Keystone RV Co.,* 455 F.3d 812, 815

(7th Cir. 2006); *see also Coffman v. Indianapolis Fire Dep't,* 578 F.3d 559, 564 (7th Cir. 2009)

("Title VII is not a panacea for bad behavior in the workplace").

Kalus also bases her hostile work environment claim on her "Centers of Excellence"

proposal about pay inequity, which she contends Emtec did not embrace.  Kalus, however, does

not properly support the factual foundation of this argument in accordance with Local Rule 56.1.

Moreover, counsel's unsupported arguments in Kalus' legal memoranda are not a substitute for

presenting evidence.  *See United States v. Chapman,* 694 F.3d 908, 914 (7th Cir. 2012).  That

being said, Kalus posits that there was pay inequity in Emtec's HCM Practice because Emtec

paid some female practice managers less than some male managers.  Without sufficiently

describing and factually supporting certain variables of each manager, such as education or

experience, or explaining why she excluded some managers from her analysis, Kalus highlights

these different salaries in a chart that reflects that the highest earner is a man, but that several

female managers make more money than other male managers.  (Pl.'s Stmt. Add'l Facts ¶¶ C, D,

E.)  As such, this chart does not support Kalus' allegations of pay inequity among the practice

managers, especially because the record does not support the conclusions she draws. *See Cracco,* 559 F.3d at 632. Also, Kalus, Given, and Siler were not included in the analysis and chart because they are not HCM practice managers, but National Practice Managers, therefore, Kalus is not arguing that she was a victim of this alleged pay inequity. Nonetheless, Kalus contends that when she talked about this pay inequity report with Diana Romano, Emtec's Human Capital Group Manager, Romano told her that "this is a boys' club" and directed her to not "rock the boat." Romano's isolated statements are not sufficiently severe or pervasive to raise an issue of fact as to Kalus' hostile work environment claim. *See Passananti v. Cook Cty.,* 689 F.3d 655, 667 (7th Cir. 2012) ("Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment.").

Also, Kalus points to the fact that she was the only National Practice Director who did not have an assigned office, cubicle, or desk, although other Emtec employees did not have assigned work spaces due to their travel schedules and the structure of the office. Assuming this allegation is true, Kalus does not sufficiently explain how her lack of an assigned work area amounts to a hostile work environment based on her gender nor does she cite to any legal authority supporting her argument. In other words, Kalus has failed to show a sufficient connection between her gender and the fact that she did not have an assigned work area. *See Orton-Bell,* 759 F.3d at 774; *Zayas v. Rockford Mem'l Hosp.,* 740 F.3d 1154, 1159 (7th Cir. 2014).

Looking to the totality of the circumstances and viewing the facts and all reasonable inferences in her favor, Kalus has failed to present sufficient evidence creating a genuine issue of material fact for trial to support her hostile work environment claim based on gender. *See Porter*

*v. City of Chicago*, 700 F.3d 944, 955-56 (7th Cir. 2012). The Court accordingly grants Defendants' summary judgment motion as to Kalus' hostile work environment claim as alleged in Count I of the First Amended Complaint. *See Celotex*, 477 U.S. at 322 ("plain language of Rule 56[] mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

## II. ADA, Title VII, and FMLA Discrimination Claims

Next, Defendants maintain that Kalus cannot establish her discrimination claims under the ADA, Title VII, or FMLA–as alleged in Counts I, II, and III–because she has failed to present evidence creating a genuine dispute of material fact for trial that she suffered an adverse employment action. *See Ripberger v. Corizon, Inc.,* 773 F.3d 871, 879 (7th Cir. 2014) (Title VII); *James v. Hyatt Regency Chicago,* 707 F.3d 775, 781-82 (7th Cir. 2013) (FMLA); *Dickerson v. Board of Trs. of Cmty. Coll. Dist. No. 522,* 657 F.3d 595, 601 (7th Cir. 2011) (ADA).[4] "The idea behind requiring proof of an adverse employment action is simply that a statute which forbids *employment* discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace." *Hunt v. City of Markham, Ill.,* 219 F.3d 649, 653 (7th Cir. 2000) (emphasis in original).

Here, Kalus contends that she was constructively discharged arguing that the "story of Reid and Emtec's demotion and constructive discharge of Kalus is set forth fully" in her Rule

---

[4] Kalus makes no attempt to establish that she is a qualified individual with a disability within the meaning of the ADA, as required to bring an ADA discrimination claim. *See Kauffman v. Petersen Health Care VII, LLC,* 769 F.3d 958, 964 (7th Cir. 2014). Also, Kalus did not allege a failure to accommodate claim in her Amended Complaint nor in her EEOC Charge. *See Taylor-Novotny v. Health Alliance Med. Plans, Inc.,* 772 F.3d 478, 493 (7th Cir. 2014).

56.1(b)(3)(A) response and declaration. The Seventh Circuit has long held, however, that "a district court is not required to scour the record looking for factual disputes [or] scour the party's various submissions to piece together appropriate arguments. A court need not make the lawyer's case." *Diadenko*, 741 F.3d at 757 (citation omitted). Furthermore, as discussed above, the Court will not consider the facts that both Kalus and Defendants added to their Rule 56.1(b)(3)(A) responses,[5] *see Cichon,* 401 F.3d at 809, nor Kalus' recent averments that contradict her own deposition testimony.

To establish constructive discharge, Kalus must show that her working environment became so intolerable or unbearable—from the standpoint of a reasonable employee—that her September 17, 2012, voluntary resignation was an appropriate response. *See Garofalo v. Village of Hazel Crest,* 754 F.3d 428, 437 (7th Cir. 2014) (citing *Pennsylvania State Police v. Suders,* 542 U.S. 129, 134, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)). The *Suders* Court emphasized that although a plaintiff may show a hostile work environment by establishing that she was subjected to severe or pervasive harassment, a further showing is necessary to establish constructive discharge. *See id.* at 134; *see also Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 650 (7th Cir. 2011) ("Establishing constructive discharge is more difficult than establishing a hostile work environment."). Because Kalus has not presented sufficient evidence to establish her hostile work environment claim, she cannot establish constructive discharge under this method because, to do so, she must show "working conditions even more egregious than that required for a hostile

---

[5] Kalus, for example, argues that she was shorted her quarterly bonus and directs the Court's attention to her amended response to Defendants' Rule 56.1(a) statement of facts "for a discussion of this issue." As stated, the Court will not address arguments that the parties made in their Rule 56.1 filings. *See Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006).

work environment claim because employees are generally expected to remain employed while seeking redress." *Chapin v. Fort-Rohr Motors, Inc.,* 621 F.3d 673, 679 (7th Cir. 2010).

The Court thus turns to the second method of establishing constructive discharge, namely, when "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *Fischer v. Avanade, Inc.,* 519 F.3d 393, 409 (7th Cir. 2008). Simply put, constructive discharge occurs when "based on an employer's actions, the handwriting [was] on the wall and the axe was about to fall." *Id.* (citations and quotation marks omitted); *see also Hunt,* 219 F.3d at 655 ("'constructive discharge' refers to the situation in which an employer, without firing an employee, makes his working conditions so miserable that it drives him to quit."). "This form of constructive discharge, however, does not eliminate the need for the plaintiff to show that his working conditions had become intolerable" and a "working condition does not become intolerable or unbearable merely because a 'prospect of discharge lurks in the background.'" *Chapin,* 621 F.3d at 679 (citation omitted). Under this method of establishing constructive discharge, Kalus must present evidence creating a genuine issue of material fact for trial that no reasonable person standing in her shoes would believe that had she not resigned, Emtec would have immediately fired her. *See id.* at 680.

Here, Kalus has not set forth evidence showing that her termination was immediate or imminent. *See id.*; *Fischer*, 519 F.3d at 409. Instead, Kalus bases her constructive discharge on Reid's business decisions about the Oracle Fusion software practice and the events that followed. More specifically, in February 2012, Reid told the three Oracle National Practice Directors, namely, Kalus, Given, and Siler, that Emtec planned to expand its Oracle practice to work with

15

Oracle's new Fusion software and that he had decided to incorporate the Fusion practice into the existing Oracle practice groups led by Kalus, Given, and Siler. At some point in May 2012, however, Reid decided to make structural changes to the Oracle group by separating the Fusion practice from the existing practice groups and creating a stand-alone Fusion practice, after which Reid hired Steven Bentz as the Oracle Fusion Practice Lead in July 2012.

Kalus insists that Reid demoted her and hired Steven Bentz to replace her, yet undisputed evidence in the record indicates that Kalus remained the National Practice Director of the Oracle HCM Practice until the day she resigned, after which Reid offered the position to Jaynie Cosenza. As the record reveals, Kalus had certain Oracle Fusion responsibilities for a temporary time period starting in February 2012. After Reid hired Bentz to lead the Oracle Fusion practice in July 2012, Kalus was to continue with her original tasks and responsibilities after she returned from her FMLA leave. Moreover, throughout her tenure with Emtec, Kalus' salary remained the same. (Defs.' Stmt. Facts ¶¶ 11, 68.) And, despite Kalus' arguments to the contrary, she was aware of the plan to create a stand-alone Oracle practice group from at least June 14, 2012, as evidenced by Reid's email to her on that date in which he stated that as of July 21, 2012, "Oracle Fusion HCM related services will not be part of the HCM practice and I will be hiring someone to manage that area of speciality." (R. 79-3, Pl.'s Ex. K; R. 77, Pl.'s Rule 56.1 Stmt. Facts ¶ Q(1)(k).)

In further support of her constructive discharge argument, Kalus asserts that she lost access to the Oracle Partner Network while she was on medical leave, specifically, from June 18, 2012, until August 23, 2012, and that instead of just restoring it, Siler and Reid "spooked" Dombrowski into requiring an "OK" from her surgeon before they would restore access. To

factually support this argument, Kalus relies on emails between Reid and Dombrowski concerning Kalus' request for access to the Oracle Partner Network website.  (Pl.'s Stmt. Facts ¶ IV.U.)  In an August 20, 2012, email to Dombrowski, Reid explains, "[w]e did get a request from her to grant her this access but we did not want to do that since she was on leave and is not supposed to be working."  (Pl.'s Ex. R.)  He followed-up stating, "[w]e can give her access if that [is] your recommendation."  (*Id.*)  Dombrowski responded in an August 21, 2012, email requesting that Reid activate Kalus' account, stating "[w]e have a note from her doctor that permits her to be online."  (*Id.*)  These emails do not support the proposition that Siler and Reid "spooked" Dombrowski into requiring Kalus' surgeon to approve her online use and Kalus' speculation does not prove otherwise.  *See Miller,* 761 F.3d at 827 ("speculation, hunches and intuition cannot defeat summary judgment").

Similarly, Kalus attempts to support her constructive discharge claim by arguing that although Reid granted her request to borrow 40 hours of medical paid time off in late May 2012, he refused to grant her request in late June 2012 to borrow an additional 40 hours.  To clarify, Kalus asked for a second advance of her paid time off to supplement her short-term disability payments explaining that when she returned to work she could accrue the borrowed paid time off.  (Defs.' Stmt. Add'l Facts ¶ 23.)  Reid denied Kalus' second request stating that the financials in the group were not in a "comfortable spot" and whether Kalus would return to work in September 2012 was not "set in stone."  (*Id.* ¶ 24; Pl.'s Ex. P.)  The parties do not dispute that it was within Reid's discretion whether to advance Kalus the additional time off.  (*Id.* ¶ 22.)  Instead, Kalus interpreted Reid's comment that her return to work was "not set in stone" as an indication that Reid intended to terminate her employment.  (*See* Pl.'s Ex. P.)  Although Kalus

may have believed that Reid wanted to fire her based on this communication, there is also evidence in the record that Kalus had explained to Reid "there is no way to predict the outcome of any surgery, but that if it were successful, she looked forward to returning to her job at Emtec." (Pl.'s Stmt. Facts ¶ P.2.) Therefore, Kalus, herself, was not entirely sure if she was returning to work in September 2012. In addition, there is also evidence in the record that after Reid sent Kalus this email, Dobrowski advised Kalus that Reid was not terminating her employment. (Pl.'s Ex. P, Dombrowski 6/27/12 email.) In any event, Kalus' disappointment in not being able to borrow more paid medical leave does not support her constructive discharge allegations because "[w]hile adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Chaib v. Indiana,* 744 F.3d 974, 982 (7th Cir. 2014) (citation omitted).

Kalus points to other bits and pieces of evidence to support of her argument that "the axe was about to fall." Kalus, however, was not aware of these emails, notes, and communications prior to her September 17, 2012, resignation, therefore, these communications do not establish that Emtec's conduct communicated to Kalus that Emtec would imminently terminate her. *See, e.g., Jones v. National Council of YMCA,* ___F.Supp.3d ___, 2014 WL 2781579, at *43-44 (N.D. Ill. June 18, 2014). Put differently, because Kalus was unaware of these communications, they do not shed any light on whether Emtec acted "in a manner so as to have communicated to a reasonable employee that she will be terminated." *Chapin,* 621 F.3d at 679 (citation omitted).

Examples of these bits of evidence unknown to Kalus before her resignation include a conversation that Reid and Dombrowski had on September 7, 2012, in anticipation of Kalus returning to work from her FMLA leave, in which they discussed how to welcome Kalus back to

work.  (Pl.'s Stmt. Facts ¶ AA.)  Specifically, Kalus points to references that Reid and Dombrowski "wanted to be sensitive to the perception of retaliation," and stated that it "would be a good idea to have a conversation on Monday once Kelly gets settled but early in the a.m. to go over general updates and separation of her job now that Steve Bentz is in the picture."  Other notations include "Rich asked if we act as if nothing happened and [Dombrowski] said yes," "[a]lthough FMLA is done, ADA may apply," "[n]o black and white issues we just need to see what happens," and "any termination conversation be discussed with HR before having it."  (*Id.*) These statements, if anything, indicate that Reid and Dobrowski of Human Resources were trying to abide by the FMLA when planning for Kalus' return.  The statement regarding "any termination conversation," alone, is insufficient to show that Kalus reasonably believed that her termination was imminent, especially because there is no evidence in the record that Kalus was aware of this statement or that anyone had communicated this information to her before her September 17, 2012, resignation.  *See Jones,* 2014 WL 2781579, at *44; *see also Chapin,* 621 F.3d at 679 ("a working condition does not become intolerable or unbearable merely because a 'prospect of discharge lurks in the background.'") (citation omitted).

Other evidence Kalus points to concerns a telephone conversation that Dobrowski and Emtec's Vice President of Human Capital, Deborah Branden, had with an employment lawyer on June 14, 2012.  (Pl.'s Stmt. Facts ¶ R.1.)  More specifically, Branden testified at her deposition that the telephone conversation was about Kalus' medical leave, Reid's and Kalus' June 2012 email communications about Kalus stepping down as the National Practice Director of the Oracle HCM practice, and Reid's intent to carve out Oracle Fusion into a separate practice group.  (R. 119, Ex. 1, Branden Dep., at 145-46.)  In particular, Branden testified that "I wanted

to have the advice of counsel to make sure that we were managing and that we were protecting [Kalus] and doing what we needed to do in order to make sure that we did not do anything that was going to be problematic." (*Id.*) During this telephone conversation, Dombrowski took notes. (Pl.'s Stmt. Facts ¶ R.2.) Dombrowski's notes include the following statements, among others, "didn't anticipate abrupt departure, answer/help in transition," "take on fusion–new guy," "RR has candidate in the wings," "KK to RR see you in Sept.," "she can take back Nat'l role...until she requests demotion," "and/or we would address perform. issues," "don't want it to look like she is targeted," "don't think Rich should interact," "KK terminated an ee yesterday...but forced to do it by Rich," and "very upset about email." (Pl.'s Stmt. Facts ¶ R.2; Pl.'s Ex. N.)

Based on these notes, Kalus isolates the statements "don't want it to look like she is targeted" and "until she requests a demotion" arguing that these notations made in tandem with the June 2012 telephone call to counsel support her claim that "the handwriting was on the wall," despite the fact that she did not voluntarily resign from her position as National Practice Director of the Oracle HCM Practice until three months later. In other words, even if Kalus had known about this telephone call and Dombrowski's notes in June 2012, she waited approximately three months to resign and after Dobrowski reassured her that Reid did not intend to terminate her employment. *See Chapin,* 621 F.3d at 680 ("This is not a situation where the 'handwriting was on the wall' and the plaintiff quit 'just ahead of fall of the axe," instead, "[plaintiff] quit after the axe had been put away.") (internal citation omitted); *see, e.g., Fischer,* 519 F.3d at 409-10. In fact, it is undisputed that Dombrowski and Kalus communicated throughout July and August 2012 regarding Kalus' return to work after her FMLA leave ended.

In sum, viewing the facts and reasonable inferences in Kalus' favor, she has not set forth

sufficient evidence creating a genuine issue of material fact for trial that she was constructively

discharged, namely, that her working conditions, from the viewpoint of a reasonable employee,

had become so intolerable that she had to quit. *See Roby v. CWI, Inc.,* 579 F.3d 779, 785 (7th

Cir. 2009). Further, Kalus has not presented sufficient evidence that she resigned just ahead of

her termination, but rather, she resigned after she had got a new job. *See Lindale v. Tokheim

Corp.,* 145 F.3d 953, 956 (7th Cir. 1998). As such, the Court grants Defendants' summary

judgment motion on Kalus' ADA, Title VII, and FMLA discrimination claims because she has

failed to present evidence that she suffered an adverse employment action.

## III.     FMLA Retaliation Claim

Last, Kalus alleges retaliation claims under Title VII, the ADA, and the FMLA in her

First Amended Complaint. Kalus, however, does not make any arguments in her legal

memoranda regarding her Title VII or ADA retaliation claims, and thus those claims are waived.

*See Swanson v. United States,* 692 F.3d 708, 715 (7th Cir. 2012) (arguments which are

"perfunctory and undeveloped" and 'unsupported by pertinent authority,' are subject to waiver")

(citation omitted); *see also Diadenko*, 741 F.3d at 757 ("A court need not make the lawyer's

case."). Instead, Kalus focuses on her FMLA retaliation claim in her legal memoranda in

support of her motion for partial summary judgment.

To establish a FMLA retaliation claim, Kalus must set forth evidence that Emtec took a

materially adverse action against her. *See Carter v. Chicago State Univ.,* 778 F.3d 651, 65 (7th

Cir. 2015); *Langenbach v. Wal-Mart Stores, Inc.,* 761 F.3d 792, 799 (7th Cir. 2014). "Materially

adverse actions are not limited to employment-related activities but include any actions that

would dissuade a reasonable employee from exercising his rights under the FMLA." *Cole v. Illinois,* 562 F.3d 812, 816 (7th Cir. 2009); *see also Chaib,* 744 F.3d at 987 ("The showing a plaintiff must make to set out an adverse employment action required for a retaliation claim is lower than that required for a discrimination claim."). Examples of materially adverse actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Lapka v. Cerhtoff,* 517 F.3d 974, 986 (7th Cir. 2008) (citation omitted).

Even with this lower standard, Kalus must do more than present evidence of "petty slights, minor annoyances, and simple lack of good manners." *Chaib,* 744 F.3d at 987; *see also Burlington No. &Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms.") (emphasis in original). Kalus, for example, points to an incident in which she was forced to terminate one of her female subordinates, an act that she did not feel was justified. This action, however, does not qualify as a material adverse change in Kalus' duties or responsibilities, but rather it involved Human Resources' input on the termination of her subordinate's employment. (Kalus Dep., at 266.) Moreover, Kalus has not established that she was demoted or that Emtec took away any of her original tasks, her title, or reduced her pay. Instead, Emtec reorganized the Oracle practice groups creating a stand-alone Oracle Fusion group, which resulted in Kalus' temporary Fusion-related oversight to be shifted to another practice group. This shifting of responsibilities is not a "significantly diminished material responsibility" in the context of all of Kalus' responsibilities as the Practice Director of Emtec's

Oracle HCM practice, which included marketing Oracle HCM products and services and managing a team of approximately fifteen consultants. *See Nagle v. Village of Calumet Park,* 554 F.3d 1106, 1120 (7th Cir. 2009) ("a materially adverse change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."). Also, Kalus sought FMLA leave–that Emtec granted–after many of these incidents occurred, therefore, she was not dissuaded from engaging in the protected activity in the first instance. *See Lilly v. Potter,* No. 08 C 0137, 2010 WL 4791490, at *7 (N.D. Ill. Nov. 18, 2010) (collecting cases). On a final note, the Court will not address Kalus' arguments raised for the first time in her reply brief in support of her motion for partial summary judgment because as they are waived. *See Darif v. Holder,* 739 F.3d 329 (7th Cir. 2014); *see also Hernandez v. Cook County Sheriff's Office,* 634 F.3d 906, 913 (7th Cir. 2011) ("'skeletal' arguments may be properly treated as waived, as may arguments made for the first time in reply briefs") (internal citation omitted).

Therefore, the Court grants Defendants' summary judgment motion as to Kalus' FMLA retaliation claim because Kalus did not establish a genuine issue of material fact as to the necessary elements of her claim. *See Sterk v. Redbox Automated Retail, LLC,* 770 F.3d 618, 627 (7th Cir. 2014) ("summary judgment is proper against 'a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.'") (citation omitted).

## CONCLUSION

For these reasons, the Court grants Defendants' motion for summary judgment and denies Plaintiff's motion for partial summary judgment.  The Court dismisses this lawsuit in its entirety.  **Dated:** March 23, 2015

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**